UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LAURA L. LINTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:07-cv-0048-DFH-TAB |
| | ) | |
| KB HOME INDIANA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON DEFENDANT'S MOTION TO COMPEL ARBITRATION
AND STAY PROCEEDINGS

Plaintiff Laura L. Linton filed a claim against her former employer, defendant KB Home Indiana, Inc., alleging willful violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*  KB Home has moved to compel arbitration and to stay proceedings, asserting that Linton waived the right to pursue her claim in a judicial forum by signing an agreement to arbitrate any controversy or claim arising out of or relating to her employment with KB Home, including any claims arising from the termination of that employment.  As explained below, KB Home's motion to compel arbitration and stay proceedings is granted.  The arbitration provision applies to Linton's discrimination claim and is not rendered unenforceable under the ADEA as amended by Section 201 of the  Older Workers Benefit Protection Act of 1990, Pub. L. No. 101-433, 104 Stat. 978, amending 29 U.S.C.  § 626(f).

*Factual Background*

I.      *Linton's Discrimination Claim*

Linton began working in KB Home's newly created Indiana Division as a salesperson on July 14, 2004.  Linton received a base salary and earned a commission for each new home she sold.  Her responsibilities included showing and promoting new homes, cleaning sales offices and model homes, and making personal telephone calls to prospective buyers.

Linton alleges that KB Home repeatedly passed her over for promotions and enrollment in its management training program, and that younger, less experienced candidates were selected for these opportunities.  Compl. ¶¶ 14-17, 19-27.  Linton also claims that KB Home failed to provide her with a legitimate reason why she was denied advancement opportunities.  Compl.¶ 32.  Linton resigned from KB Home on May 21, 2006.  She was 57 years old at the time. Compl. ¶ 30.  She filed this ADEA action against KB Home on January12, 2007, seeking all relief available to her under the ADEA.

II.     *The Salesperson Employment Agreement & Arbitration Provision*

Linton and KB Home formally outlined the terms and conditions of Linton's employment on February 7, 2005, when they executed a "Salesperson Employment Agreement."  Def. Ex. A.  The sixteen-page agreement describes Linton's general responsibilities, compensation structure, and eligibility for

vacations and other benefits.  It also details KB Home's operational policies and procedures, including those regarding confidentiality, termination, and dispute resolution.  The provision at issue is the arbitration portion of KB Home's employment dispute resolution policy.

The arbitration provision requires any disputes arising from Linton's employment or termination of employment with KB Home to be resolved by "mandatory and binding arbitration." Def. Ex. A, ¶ 10.  The arbitration provision identifies several federal anti-discrimination statues that fall within its ambit but does not specifically mention claims arising under the ADEA.  The provision also applies broadly to disputes arising under "any other federal, state, county or local law, statute, ordinance, decision, order, policy, or regulation prohibiting employment discrimination, providing for the payment of wages or benefits, or otherwise creating rights or claims for employees." *Id.* The provision also outlines the rules and procedures under which arbitration will take place.  It concludes with the following statement, in bold type:

> Both parties understand that by voluntarily agreeing to the terms of the arbitration procedure described herein, both are giving up any constitutional or statutory right they may possess to have covered claims decided in a court of law before a judge or jury.

Linton and a company representative initialed below this statement.  *Id.*  Both parties signed the agreement.

*Discussion*

Linton opposes enforcement of the arbitration provision on two grounds. First, she argues that the arbitration provision does not explicitly cover rights and claims arising after its execution.  Second, she argues that the waiver of a jury trial is not permitted under the Older Workers Benefit Protection Act ("OWBPA,") which was intended to ensure that any waiver of a right or claim under the ADEA was truly knowing and voluntary.  She argues that the procedural requirements for a valid waiver under the OWBPA apply to waivers of the right to a jury trial in court.  Neither argument is persuasive.

I.      *Prospective Application of the Arbitration Provision*

The last sentence of the arbitration provision states that both parties "are giving up any constitutional or statutory right they may possess to have covered claims decided in a court of law before a judge or jury."  Def. Ex. A, ¶ 10.  Linton argues that the phrase "may possess" refers only to rights possessed at the time of the signing.  She asserts that further qualifying language would be necessary to expand the scope of "may possess" beyond "may currently possess."  She does not cite any authority to support this argument.

Linton acknowledges that the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, governs this dispute.  Pl. Br. 5; see generally *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118-19 (2001) (holding that employment contracts for

workers not directly engaged in explicitly exempt commercial activities are within the scope of the FAA). The Supreme Court has interpreted the FAA to establish, as a matter of federal law, that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1984), quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

"Whether a particular issue is subject to arbitration is a matter of contract interpretation, because 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999), quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960). In deciding whether the parties agreed to arbitrate the dispute in question, courts generally apply ordinary principles of state contract law. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). "Nothing in the [FAA] overrides normal rules of contractual interpretation." *Stone v. Doerge*, 328 F.3d 343, 345 (7th Cir. 2003).

Indiana law is the relevant state law in this case. KB Home does business in Indiana, Linton resides in Indiana, and the events occurred in Indiana. Like federal law, Indiana law has long endorsed a strong policy of favoring enforcement of arbitration agreements. See, *e.g.*, *PSI Energy, Inc. v. AMAX, Inc.*, 644 N.E.2d 96,

98 (Ind. 1994) (noting that Indiana's territorial legislature adopted legislation authorizing and regulating arbitration in 1807, even before Indiana became a state); *Homes by Pate, Inc. v. DeHaan*, 713 N.E.2d 303, 306 (Ind. App. 1999) ("It is well settled that Indiana recognizes a strong policy favoring enforcement of arbitration agreements."). Indiana's view of arbitration mirrors the federal interpretation of the FAA: "When construing arbitration agreements, every doubt is to be resolved in favor of arbitration," and the "parties are bound to arbitrate all matters, not explicitly excluded, that reasonably fit within the language used." *Tamko Roofing Products, Inc. v. Dilloway*, 865 N.E.2d 1074, 1078 (Ind. App. 2007), quoting *Safety Nat. Cas. Co. v. Cinergy Corp.*, 829 N.E.2d 986, 1000 (Ind. App. 2005).

In this case, Linton asserts that the only logical interpretation of the phrase "may possess" is "may *currently* possess." The argument is groundless. The phrase is readily susceptible to an interpretation that would render her claim arbitrable. A reasonable person could easily read "may possess" to mean "might come to possess," or "might possess in the future." Linton's interpretation would render the arbitration provision essentially useless. There is no indication that the parties had any disputes at the time they signed the agreement. Its only purpose was to provide for arbitration of any potential future disputes. The arbitration provision's first sentence states that it covers "any disputes which may arise from [Linton's] employment with [KB Home] or the termination of [Linton's] employment . . . ." Def. Ex. A, ¶ 10. If the parties had intended the arbitration

provision to cover only those claims and rights possessed on or before February 7, 2005, as Linton asserts, they would not have provided for arbitration of termination disputes, which could not yet have arisen.  See *Tice v. American Airlines, Inc.*, 288 F.3d 313, 316 (7th Cir. 2002) (when conflicting interpretations arise, parties are assumed to have intended something sensible by their contract).  Linton's age discrimination claim is within the scope of the arbitration provision.

II.    *The OWBPA and Arbitration Agreements*

Linton also contends that her claim is not subject to arbitration because she did not waive her right to a judicial forum knowingly and voluntarily, as defined and required by the OWBPA's amendments to the ADEA codified in 29 U.S.C. § 626(f)(1).  She argues that the ADEA gives her a right to a jury trial that may not be waived unless the waiver procedure comports with OWBPA requirements.  She contends that because the arbitration provision itself, as well as the circumstances under which she signed it, did not comply with the requirements of the OWBPA, her agreement to arbitrate her ADEA claim should be unenforceable.  See 29 U.S.C. § 626(f)(1)(B), (E)-(G).  On its face, the parties' agreement appears to fall short of several of the OWBPA requirements, so the issue is whether those requirements apply to this arbitration agreement.[1]

_____

[1]The ADEA, as amended by the OWBPA, provides in relevant part:

An individual may not waive any right or claim under this Act unless the waiver is knowing and voluntary.  Except as provided in paragraph (2), a waiver may not be considered knowing and voluntary unless at a minimum–
(continued...)

As amended by the OWBPA, the ADEA provides:  "An individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary."  29 U.S.C. § 626(f)(1).  Linton argues that the broad reference to "any right" includes the right to a jury trial in court on her ADEA claims.  A few district courts have adopted this position.  See *Hammaker v. Brown & Brown, Inc.*, 214 F. Supp. 2d 575, 580-81 (E.D. Va. 2002) (the language of the OWBPA plainly and unambiguously applies to all rights conferred in the ADEA, including the right to a jury trial); *Thiele v. Merrill Lynch, Pierce, Fenner & Smith*, 59 F. Supp. 2d 1060, 1064-65 (S.D. Cal. 1999), reconsideration denied, 59 F. Supp. 2d 1067 (S.D. Cal. 1999) (a plain reading of the ADEA requires that waivers of any right, procedural or substantive, must meet the OWBPA requirements).  This reading of the statute is certainly respectable and consistent with the broad statutory language referring to "any right or claim."

---

[1](...continued)

. . .

(B) the waiver specifically refers to rights or claims arising under this Act;

. . .

(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;

(F)(i) the individual is given a period of at least 21 days within which to consider the agreement;

. . .

(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until after the revocation period has expired. . . .

29 U.S.C.  § 626(f)(1)(B), (E)-(G).

However, most courts that have addressed this issue, including all the federal appellate courts that have addressed it, have interpreted OWBPA's reference to "any right" to apply only to substantive rights and not to arbitration agreements that waive such procedural rights as rights to jury trials.   See *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith*, 170 F.3d 1, 13 (1st Cir. 1999), quoting *Seus v. John Nuveen & Co.*, 146 F.3d 175, 181 (3d Cir. 1998); *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 660 (5th Cir. 1995); accord, *e.g.*, *O'Kelly v. Vanguard Integrity Prof'ls, Inc.*, 2006 WL 2057225, at *4 (D. Nev. July 21, 2006); *Browning v. 24 Hour Fitness, Inc.*, 2006 WL 151933, at *2 (W.D. Wash. Jan. 19, 2006); *Nieminski v. John Nuveen & Co.*, 1997 WL 43241,  at *5 (N.D. Ill. Jan. 23, 1997).

These decisions are consistent with the Supreme Court's determination that the statutory right to a judicial forum for claims of employment discrimination is not a substantive right.  "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991), quoting *Mitsubishi,* 473 U.S. at 628.

Linton relies on *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427 (1998), for the proposition that the OWBPA "implements Congress' policy via a strict, unqualified statutory stricture on waivers, and [courts] are bound to take

-9-

Congress at its word." Linton's reliance is misplaced. The issue in *Oubre* was whether a release signed in consideration for severance pay effectively released substantive claims under the ADEA. The employer argued that even if the release failed to comply with the OWBPA's requirements, the employee had effectively ratified it by keeping the severance pay. The Supreme Court rejected the employer's argument, noting that such releases were squarely controlled by the statutory language: "Courts cannot with ease presume ratification of that which Congress forbids." 522 U.S. at 427. The Court in *Oubre* did not consider the OWBPA's application to the waiver of procedural rights. As the First Circuit explained in *Rosenberg*, the reference in *Oubre* only to the waiver of "an ADEA *claim*" suggests, if anything, that the OWBPA's waiver requirements apply to substantive ADEA claims and not necessarily to arbitration agreements. 170 F.3d at 13 (emphasis in original).

Practical considerations support this conclusion. Applying the OWPBA to agreements to arbitrate would produce some strange results. Suppose an employer wants to hire a new employee but is willing to do so only if the employee is willing to agree to arbitrate employment discrimination claims, including ADEA claims. The employer and the employee are both eager for the employee to begin work. Yet the OWBPA requires that the employee be given at least 21 days to consider the arbitration agreement, and at least 7 days after execution of the agreement in which to revoke her consent. 29 U.S.C. § 626(f)(1)(F) & (G). The

employer and employee would not have a binding agreement on the terms of the new employment for at least another 28 days.

In *Gilmer*, the Supreme Court placed the burden of demonstrating Congress' intent to preclude a waiver of a judicial forum for ADEA claims squarely on the party seeking to avoid arbitration.   *Gilmer*, 500 U.S. at 26, citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987).  "If such an intention exists, it will be discoverable in the text of the ADEA, its legislative history, or an 'inherent conflict' between arbitration and the ADEA's underlying purposes."   *Id.*   The same logic applies today, though the ADEA must be considered in its present form, as amended by the OWBPA.  As always, "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration."  *Gilmer*, 500 U.S. at 26, quoting *Moses H. Cone*, 460 U.S. at 24.

Linton makes no effort to discuss Congress' intent in passing the OWBPA, but legislative records and unsuccessful attempts by other plaintiffs indicate that she would have difficulty carrying the burden placed upon her by the *Gilmer* Court.[2]  Congress enacted the OWBPA to "ensure[ ] that older workers are not

---

[2]In a virtually identical case, *O'Kelly v. Vanguard Integrity Prof'ls, Inc.*, 2006 WL 2057225 (D. Nev. July 21, 2006), the plaintiff, like Linton, relied heavily on *Thiele* and emphasized the "plain meaning" of the statutory language. The court found that "Plaintiff has not sufficiently met his burden of showing that Congress intended to preclude a waiver of judicial forum for ADEA claims."  *O'Kelly*, 2006 WL 2057225, at *4.

coerced or manipulated into waiving their rights to seek legal relief under the ADEA." S. Rep. No. 101-236, at 5 (1990), reprinted in 1990 U.S. Code Cong. & Ad. News 1509, 1510. Congress was particularly concerned that early retirees or other employees offered the chance to participate in exit incentive or other group termination programs could effectively be forced to waive their right to file a claim if employers conditioned participation on the signing of a waiver. H.R. Rep. No. 101-664, at 22 (1990). Congress did not explicitly preclude the arbitration of claims under the OWBPA, *Gilmer*, 500 U.S. at 29, nor does the legislative history indicate that Congress intended the OWBPA to affect arbitration agreements. See, *e.g.*, *Rosenberg*, 170 F.3d at 13, quoting *Seus v. John Nuveen & Co.*, 146 F.3d 175, 181 (3d Cir. 1998); *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656, 660 (5th Cir. 1995). "Congress certainly may act to preclude arbitration, but its failure to do so clearly here means there was no such intent." *Rosenberg*, 170 F.3d at 13; see also Douglas E. Abrams, *Arbitrability in Recent Federal Civil Rights Legislation: The Need for Amendment*, 26 Conn. L. Rev. 521, 555-56 n.187 (1994) (opining that the "[a]rbitrability of ADEA claims. . . remains untouched by the [OWBPA]" and observing that Congress, for the preceding two decades, referred specifically to arbitration when it intended to "reach the [FAA] mandate's effect on agreements covering claims under a particular statute").

The court is aware of the sharp tension between the higher courts' approaches to interpreting the OWBPA and the FAA. In holding that the FAA may apply to enforce arbitration agreements between most employers and employees

(those other than the railroad workers and seamen specifically excluded in the 1925 legislation), the Supreme Court majority in *Circuit City v. Adams* focused strictly on the broad statutory text: "a contract evidencing a transaction involving commerce" and the specific exclusion for seamen and railroad workers. The Court majority gave no weight to what it conceded were "not insubstantial" historical arguments showing persuasively that Congress did not intend the FAA to apply to any employment agreements at all. 532 U.S. at 119; see *id.* at 125-29 (Stevens, J., dissenting) (showing that the FAA clearly was not intended to apply to any employment agreements, and that specific exclusion for seamen and railroad workers was intended only to clarify that intention to eliminate labor union opposition – opposition that now looks prescient); see also *Zuni Public School Dist. No. 89 v. Dep't of Education*, 550 U.S. —, —, 127 S. Ct. 1534, 1549-50 (2007) (Stevens, J. concurring) (explaining benefits of looking to legislative history and other traditional tools of statutory construction).[3]

---

[3]In *Circuit City*, Justice Stevens concluded his dissent:

> This case illustrates the wisdom of an observation made by Justice Aharon Barak of the Supreme Court of Israel. He has perceptively noted that the "minimalist" judge "who holds that the purpose of the statute may be learned only from its language" has more discretion than the judge "who will seek guidance from every reliable source." Judicial Discretion 62 (Y. Kaufmann transl. 1989). A method of statutory interpretation that is deliberately uninformed, and hence unconstrained, may produce a result that is consistent with a court's own views of how things should be, but it may also defeat the very purpose for which a provision was enacted. That is the sad result in this case.

532 U.S. at 133.

Nevertheless, the *Circuit City* majority was exactly that, the majority.  It would not help matters to have other courts decide other statutory questions by similarly closing their eyes to the available indications of the purpose and intent of the OWBPA.  Linton can argue quite credibly that if courts were to apply the same narrow focus to the broad text of the OWBPA – "any right or claim" – there is no reason not to apply that language to waivers of rights to jury trials in court.  However, the better approach to the OWBPA, without spreading further the ahistorical methodology of the *Circuit City* majority, is to limit the application of that language to substantive rights and claims under the ADEA.

*Conclusion*

For the foregoing reasons, defendant KB Home's motion to compel arbitration and stay proceedings in this court is granted.  The parties shall proceed with arbitration as provided by their agreement.  All proceedings in this action are stayed pending further order of the court.  The case will be closed administratively, subject to the right of either party to seek relief from the stay.

So ordered.

Date: July 5, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

-14-

Copies to:

Peter Alan Fisher
PETER A. FISHER, ATTORNEY AT LAW
paf4456@msn.com

Michael A. Moffatt
LITTLER MENDELSON, P.C.
mmoffatt@littler.com

Todd M. Nierman
LITTLER MENDELSON, P.C.
tnierman@littler.com

Dustin D. Stohler
LITTLER MENDELSON, P.C.
dstohler@littler.com